| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:16-cv-440-GNS |
| | ) | |
| MD2U HOLDING COMPANY; | ) | |
| | ) | |
| MD2U, PLLC; | ) | |
| | ) | |
| MD2U KENTUCKY, LLC; | ) | |
| | ) | |
| MD2U INDIANA, LLC; | ) | |
| | ) | |
| MD2U FLORIDA, LLC; | ) | |
| | ) | |
| MD2U OHIO, LLC; | ) | |
| | ) | |
| MD2U LOUISIANA, LLC; | ) | |
| | ) | |
| MD2U NORTH CAROLINA, LLC; | ) | |
| | ) | |
| MD2U TENNESSEE, LLC; | ) | |
| | ) | |
| MD2U MANAGEMENT, LLC; | ) | |
| | ) | |
| MD2U FRANCHISING, LLC; | ) | |
| | ) | |
| MD2U IAH, LLC; | ) | |
| | ) | |
| J. MICHAEL BENFIELD, M.D.; | ) | |
| | ) | |
| GREG LATTA; AND | ) | |
| | ) | |
| KAREN LATTA | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT OF THE UNITED STATES OF AMERICA**

Plaintiff, United States of America (the "United States" or the "Government"), by its attorneys, alleges as follows:

## INTRODUCTION

1. This is an action for statutory damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733 against the defendants for the submission of false or otherwise fraudulent claims to federally funded health insurance programs.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, over the remaining claims pursuant to 28 U.S.C. §1345, and over all claims pursuant to the Court's general equitable jurisdiction.

3. Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c), as the defendants reside and/or have conducted business in this District.

## THE PARTIES

4. The Plaintiff is the United States of America.

5. The Defendant, MD2U Holding Company, is a Kentucky corporation incorporated in May 2013 with its principal office located in Louisville, Kentucky.

6. The Defendant, MD2U, PLLC, is a Kentucky limited liability company incorporated in June 2004 with its principal office located in Louisville, Kentucky.

7. The Defendant, MD2U Kentucky LLC, is a Kentucky limited liability company incorporated in July 2010 with its principal office located in Louisville, Kentucky.

8. The Defendant, MD2U Indiana, LLC, is a Kentucky limited liability company incorporated in July 2010 with its principal office located in Louisville, Kentucky.

9. The Defendant, MD2U Florida, LLC, is a Kentucky limited liability company incorporated in January 2011 with its principal office located in Louisville, Kentucky.

10. The Defendant, MD2U Ohio, LLC, is a Kentucky limited liability company incorporated in December 2010 with its principal office located in Louisville, Kentucky.

11. The Defendant, MD2U Louisiana, LLC, is a Kentucky limited liability company incorporated in January 2011 with its principal office located in Louisville, Kentucky.

12. The Defendant, MD2U North Carolina, LLC, is a Kentucky limited liability company incorporated in August 2012 with its principal office located in Louisville, Kentucky.

13. The Defendant, MD2U Tennessee, LLC, is a Kentucky limited liability company incorporated in July 2013 with its principal office located in Louisville, Kentucky.

14. The Defendant, MD2U Management, LLC, is a Kentucky limited liability company incorporated in July 2010 with its principal office located in Louisville, Kentucky.

15. The Defendant, MD2U Franchising, LLC, is an inactive Kentucky limited liability company incorporated in February 2008 with its principal office located in Louisville, Kentucky.

16. The Defendant, MD2U IAH, LLC, is a Kentucky limited liability company incorporated in September 2014 with its principal office located in Louisville, Kentucky.

17. The Defendants MD2U Indiana, LLC; MD2U, PLLC; MD2U Florida, LLC; MD2U Kentucky, LLC; MD2U Ohio, LLC; MD2U Louisiana, LLC; MD2U North Carolina, LLC; MD2U Tennessee, LLC; MD2U Management, LLC; MD2U Franchising, LLC; MD2U IAH, LLC; and MD2U Holding Company are referred to in this Complaint collectively as "MD2U" or "Corporate Defendants."

18. The Defendant J. Michael Benfield, M.D. is a licensed physician residing in Louisville, Kentucky. At all times relevant to this Complaint, Dr. Benfield has been the Chief Executive Officer and President of MD2U. Dr. Benfield is also an owner of MD2U.

19. The Defendant Greg Latta is a resident of Louisville, Kentucky. At all times relevant to this Complaint, Mr. Latta has been the Chief Information Officer of MD2U. Mr. Latta is also an owner of MD2U.

20. The Defendant Karen Latta is a resident of MD2U. At all times relevant to this Complaint, Ms. Latta has been the Chief Operations Officer of MD2U. Ms. Latta is also an owner of MD2U.

21. MD2U provides primary care to patients who are home bound or home limited. MD2U's business model is premised on using nurse practitioners or physician assistants to deliver routine health care visits in a patient's home.

## GOVERNMENT HEALTH CARE PROGRAMS

*The Medicare Program*

22. At all times relevant to this Complaint, the United States, through the U.S. Department of Health and Human Services (HHS), administers a federally financed health insurance program for persons age 65 and over and for those who are disabled (the "Medicare Program"). The Hospital Insurance Program for the Aged and Disabled is established by Part A ("Medicare Part A") and the Supplementary Medical Insurance Program is established by Part B ("Medicare Part B") program, Title XVIII of the Social Security Act under 42 U.S.C. § 1395 et seq.

23. Overall responsibility for the administration of the Medicare Program resides with HHS.

24. Within HHS, the responsibility for the administration of the Medicare Program has been delegated to the Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA).

25. Medicare Part B helps cover physician and qualified non-physician practitioner (NPP) services and outpatient care. It also covers some other medical services that Medicare Part A does not cover. Medicare Part B helps pay for these covered services and supplies when they are medically necessary. Medicare Part B provides federal government funds to help pay for, among other things, certain visits provided by health care providers to Medicare beneficiaries.

26. Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Eligible individuals who are age 65 or older, or disabled, may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by HHS. 42 U.S.C. §§ 1395j, 1395o, 1395r.

27. Individuals or entities who are participating providers in Medicare may seek reimbursement from this program for services rendered to patients who are program beneficiaries, provided that the services are rendered in compliance with the laws, rules, regulations, policies and procedures governing reimbursement.

28. Health care providers use a uniform system of coding to report professional services, procedures, supplies and diagnoses. Medical services are assigned a number and are listed in certain publications. The Physicians Current Procedural Terminology (CPT) code set is a medical code set maintained by the American Medical Association (AMA) through the CPT Editorial Panel. The CPT code set describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical

services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes.

29. Physicians, NPPs, outpatient facilities, and hospital outpatient departments report CPT codes to identify procedures furnished during a patient encounter. CPT codes are used to bill for services furnished to patients and for services being billed on claims other than inpatient claims.

30. CMS utilizes the CPT code set to be used by health care providers when billing Medicare for most Part B services. Each CPT code is assigned an allowable charge. The allowable charges are published in a fee schedule.

31. Medicare Part B reimburses providers of health care services 80% of the lesser of the actual charge or the fee schedule under the appropriate CPT code. 42 U.S.C. § 13951(a).

32. Evaluation and management (E&M) codes refer to visits and consultations furnished by physicians and the following qualified NPPs: (a) Nurse practitioners; (b) Clinical nurse specialists; (c) Certified nurse midwives; and (d) Physician assistants.

33. The code sets used to bill for E&M services are organized into various categories and levels. In general, the more complex the visit, the higher the level of code the physician or NPP may bill within the appropriate category. In order to bill any code, the services furnished must meet the definition of the code. It is the provider's responsibility to ensure that the codes selected reflect the services furnished.

34. Medicare will not pay for any service that is not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member; reasonable and necessary for the prevention of illness; or reasonable and necessary for the palliation or management of terminal illness. 42 U.S.C. §

1395y(a)(1)(A) – (C). Medicare excludes from coverage routine physical checkups that are performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury. 42 C.F.R. § 411.15(a). This exclusion also includes any service that is not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. 42 C.F.R. § 411.15(k)(1).

35. Medicare's Claims Processing Manual states that "Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted. The volume of documentation should not be the primary influence upon which a specific level of service is billed." Chapter 12, Transmittal 30.6.1 - Selection of Level of Evaluation and Management Service.

36. With regard to home visits performed by a practitioner, such a visit cannot be done merely for the convenience of the patient: "The medical record must document the medical necessity of the home visit made in lieu of an office or outpatient visit." Chapter 12, Transmittal 30.6.1 - Selection of Level of Evaluation and Management Service, Transmittal 30.6.14.1 - Home Services (Codes 99341 - 99350), Paragraph B.

37. Physician or NPP visits to an existing patient's home are billed to Medicare using CPT codes 99347 through 99350, with the higher codes representing visits of a more complicated nature.

38. Physician or NPP visits to an existing patient residing in a domiciliary or rest home are billed to Medicare using CPT codes 99334 through 99337, with the higher codes representing visits of a more complicated nature.

*The Railroad Retirement Medicare Program*

39. The Railroad Retirement Medicare Program (RRMP) is administered under the Railroad Retirement Act of 1974, 45 U.S.C. §§ 231-231v, by the United States Railroad Retirement Board. This program is provided to railroad retirement beneficiaries age 65 or over and other persons who are directly or potentially eligible for railroad retirement benefits. It also provides coverage, in certain circumstances, before age 65 is available for disabled employee annuitants who have been entitled to monthly benefits based on total disability for at least 24 months and have a disability insured status under social security law.

40. Medicare and the RRMP (collectively the "Government Health Care Programs") are all plans or programs that provide health benefits, whether directly, through insurance, or otherwise, and which are funded directly, in whole or in part, by the United States Government.

41. Providers reimbursed pursuant to Government Health Care Programs, such as MD2U, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by the Government Health Care Programs.

42. Providers reimbursed pursuant to Government Health Care Programs, such as MD2U, have a duty to familiarize itself with the statutes, regulations and guidelines regarding coverage of the Government Health Care Programs' products and services.

43. A provider, such as MD2U, who receives reimbursement under Government Health Care Programs must also meet certain obligations, including not making false statements or misrepresentations of material facts concerning requests for payment under the Government Health Care Programs.

44. Throughout its existence, MD2U has submitted claims to the Government Health Care Programs for reimbursement. MD2U has received reimbursement from the Government Health Care Programs based on the claims submitted by CMC.

45. Defendants Dr. Benfield, Karen Latta and Greg Latta received financial benefit as a result of MD2U billing Government Health Care Programs.

BACKGROUND

46. Between July 1, 2007, through November 30, 2014, MD2U was enrolled as a provider with the Government Health Care Programs. As an enrolled provider, MD2U was permitted to submit claims to the Government Health Care Programs for payment.

47. Between July 1, 2007, through November 30, 2014, MD2U employees (typically NPPs) visited beneficiaries of the Government Health Care Programs in their residences. MD2U would bill the Government Health Care Programs for E&M codes related to these NPP visits. In almost every instance, MD2U billed the Government Programs for the highest level E&M code, CPT codes 99337 and 99350, when providing services to established patients.

48. CPT code 99337 is used by health care practitioners who provide services in a domiciliary or rest home visit for the evaluation and management of an established patient. Proper use of this code requires that at least 2 of the 3 following components be performed by the practitioner: (1) a comprehensive interval history; (2) a comprehensive

examination; and (3) medical decision making of moderate to high complexity. Use of this code is reserved for patients who present with problem(s) that are of moderate to high severity. The AMA guidelines for this code indicate and that practitioner's using this code typically spend 60 minutes with the patient and/or family or caregiver.

49. CPT code 99350 is used by health care practitioners who provide a home visit for the evaluation and management of an established patient. Proper use of this code requires that at least 2 of the 3 following components be performed by the practitioner: (1) a comprehensive interval history; (2) a comprehensive examination; and (3) medical decision making of moderate to high complexity. Use of this code is reserved for patients who present with problem(s) that are of moderate to high severity. The AMA guidelines for this code indicate and that practitioner's using this code typically spend 60 minutes face-to-face with the patient and/or family.

## FALSE BILLING

*Patients Neither Homebound nor Home-Limited*

50. In order for MD2U to perform reimbursable E&M visits to a Government Health Program beneficiary in their residence, the patient had to be homebound (i.e. confined to the home) or home-limited (i.e. the patient has severe functional limitations making it difficult for the patient to leave his or her residence).

51. MD2U improperly billed the Government Health Care Programs for E&M visits by embellishing and, at times, fabricating the homebound or home-limited status of its patients.

52. MD2U required NPPs to document that patients were homebound or home-limited and indicate in the medical record that an outpatient visit would jeopardize the patient's

health, regardless as to whether this was true or not. A significant number of MD2U patients were neither home-bound nor home-limited, as some patients worked outside the home, attended school outside the home, drove independently, routinely saw other providers in the office, and in at least one case, went horseback riding.

*Medically Unnecessary Visits*

53. MD2U required NPPs to perform medically unnecessary visits, and improperly billed the Government Health Care Programs for E&M visits using 99337 or 99350 in order to generate revenue.

54. MD2U instructed NPPs to see all patients every month. In performance reviews, NPPs were instructed to schedule patients at times more frequently to increase their productivity.

55. When patients requested less frequent visits, NPPs were instructed to tell them that Medicare requires that they be seen 15 times per year.

56. NPPs would sometimes document orders in patient charts for a follow-up visit beyond 4 weeks (i.e. 8-weeks or 12-weeks) when they believed it was clinically appropriate. However, MD2U patient care coordinators (located in MD2U's Louisville, Kentucky, corporate office) would often ignore the NPP's order and schedule a follow-up visit at 4 week intervals at direction of MD2U management, including Dr. Benfield, Greg Latta and Karen Latta. At times, NPPs would not perform a follow-up visit at 4 weeks, only to have MD2U send a different provider to see that patient every 4 weeks.

*Upcoding*

57. MD2U improperly billed the Government Health Care Programs for E&M visits using CPT code 99337 or 99350 when a lower CPT code would have been more appropriate.

58. For example, a Statistical Sampling for Overpayment Estimation (SSOE) was prepared for all Medicare claims submitted by MD2U between July 1, 2007, through November 30, 2014, for E&M services provided to Medicare patients residing in Kentucky. A review of the patient files selected as part of the SSOE revealed that 98 percent of all claims were falsely billed to Medicare by MD2U because either the visits were not medically necessary or MD2U billed the E&M service at the highest CPT level when it should have been billed using a lower level CPT code.

59. A review of MD2U's billings between July 1, 2007, through November 30, 2014, also reveals that MD2U is an extreme outlier in its frequency of billing the highest level E&M CPT codes (99337 and 99350) when compared to other Medicare providers in Kentucky, the states in which it operates, or nationally.

60. Many patient encounters performed by NPPs typically lasted fewer than 10 minutes, with some lasting less than 5 minutes (one even lasted a mere 34 seconds). These encounters did not involve NPPs performing a comprehensive interval history; a comprehensive examination; or medical decision making of moderate to high complexity.

61. Despite the short duration of these visits and absence of the NPP performing a comprehensive interval history, a comprehensive examination, or medical decision making of moderate to high complexity, MD2U falsely billed these E&M service to the Government Health Care Programs at the highest CPT level (99337 or 99350).

62. NPPs were trained and instructed by MD2U employees (including but not limited to Dr. Benfield, Greg and Karen Latta) to bill all of their visits using the highest level E&M CPT code.

63. MD2U's corporate culture was a "one code fits all" mentality, as NPPs were trained to always code visits using the highest level E&M CPT code, regardless of whether the CPT code was appropriate.

64. NPPs who routinely failed to code their encounters using the highest level E&M CPT code would have their charts audited by MD2U personnel and were often re-educated or disciplined.

*Cloning of Medical Records in Order to Justify Visits*

65. MD2U also utilized an electronic medical records (EMR) system that permitted the NPPs to easily electronically cut, copy and paste medical notes from prior visits. The ability to migrate notes from visits that occurred weeks, months, or even years prior to the current patient encounter created the illusion that MD2U's NPPs were performing a significant amount of work during their patient encounters when, in fact, they were not.

66. In order to justify the highest level E&M CPT code for a particular visit, NPPs were directed to always document at least 3 chronic conditions, that at least 8 systems were reviewed, and that at least 8 organ systems were examined even though this work was not performed by the NPP during the patient encounter.

67. NPPs would typically accomplish this documentation by electronically copying notes from an early visit using MD2U's EMR system – thereby cloning medical records from one visit to the next, over and over and over again.

68. If the documentation was deficient to bill the highest level CPT code, MD2U's chart auditors and the Vice-President of Compliance would direct NPPs to go back and change the medical record – after the encounter had occurred – to falsely show that more work was performed during the visit in order to support the highest level billing.

69. Dr. Benfield, Greg and Karen Latta were aware that NPPs were billing at the highest level CPT code for E&M visits even though such billings were rarely appropriate.

70. Under the control of Dr. Benfield, Greg and Karen Latta, MD2U improperly billed the Government Health Care Programs for the highest level E&M CPT code and created a system wherein medical records were fabricated in order to justify the highest level CPT code being billed to the Government Health Care Programs.

## COUNT I
## FALSE CLAIMS ACT - 31 U.S.C. §§ 3729(a)(1)
## KNOWINGLY PRESENTING OR CAUSING TO BE PRESENTED A FALSE CLAIM

71. Paragraphs 1 through 71 are realleged as though fully set forth herein.

72. Between July 1, 2007, through at least November 30, 2014, Defendants knowingly presented, or caused others to present, to an officer, employee or agent of the United States ("Government") false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733.

73. Between July 1, 2007, through at least November 30, 2014, Defendants knowingly made, used or caused to be made or used false records and statements to get false or fraudulent claims paid or approved by the Government in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733.

74. As used herein, the word "knowingly" means that a person, with respect to information (a) has actual knowledge of the information, (b) acts in deliberate ignorance of the truth or falsity of information, or (c) acts in reckless disregard of the truth or falsity of the information.

75. Because of Defendants' acts, the Government sustained damages.

## COUNT II
## FALSE CLAIMS ACT - 31 U.S.C. §§ 3729(a)(2)
## ALTERING RECORDS TO GET A FALSE CLAIM PAID

76. Paragraphs 1 through 77 are realleged as though fully set forth herein.

77. Between July 1, 2007, through at least November 30, 2014, Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims allowed or paid in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733.

78. As used herein, the word "knowingly" means that a person, with respect to information (a) has actual knowledge of the information, (b) acts in deliberate ignorance of the truth or falsity of information, or (c) acts in reckless disregard of the truth or falsity of the information.

79. Because of Defendants' acts, the Government sustained damages.

## COUNT III
## FALSE CLAIMS ACT - 31 U.S.C. §§ 3729(a)(3)
## CONSPIRACY TO SUBMIT FALSE CLAIMS

80. Paragraphs 1 through 80 are realleged as though fully set forth herein.

81. Defendants conspired to defraud the Government by getting a false or fraudulent claims allowed or paid in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733.

82. Because of Defendants' acts, the Government sustained damages.

## CONCLUSION

WHEREFORE, Plaintiff United States demands and prays that judgment be entered in its favor and against Defendants as follows:

1. Under Counts I, II, and III for triple damages and civil penalties between $5,500 and $11,000 for each claim violating the False Claims Act, plus costs;

2. For a jury trial; and

3. For all other relief to which the United States may be entitled.

Respectfully submitted,

JOHN E. KUHN, JR.
United States Attorney, WDKY

/s/ Benjamin S. Schecter
717 W. Broadway
Louisville, KY 40202
(502) 582-6061
Ben.Schecter@usdoj.gov